Case No. 17-2001 Ambrose Wilbanks Jr v. Ypsilanti Community Schools Argument not to exceed 15 minutes per side Ms. Tracy Vandenberg, you may proceed for the appellant Good morning, Your Honors. May it please the Court, Tracy Vandenberg, on behalf of Plaintiff Appellant Ambrose Wilbanks Jr., I'd like to reserve three minutes for rebuttal, please. Your Honor, the District Court erred in this case in two ways. First, under this Court's decision in Smith v. Perkins, this Court decided that unreviewed state agency findings do not have preclusive effect in later federal court proceedings and actions under the ADA. It's a very, very clear holding. And that's exactly what happened in this case. The District Court, sua sponte, raised the issue of due process. It wasn't even the basis for defendant's motion for summary disposition. The defendant based his motion for summary disposition on saying that we didn't establish a prima facie case of retaliation, and even if we did, there was no evidence of pretext. At oral argument, the Court said, wait, this case is about due process. And the Court said, isn't the real issue whether or not Mr. Wilbanks got due process in the school board hearing? Because, and I'm paraphrasing it, but essentially, this Court is not going to overturn an administrative hearing. And then it shifted to due process. In the decision itself, the written order memorandum, it's a little less clear. However, I think the concluding paragraph of the order supports that the Court really just was focusing on the preclusive effect of that school board hearing. The Court says, whether or not Rose's acts, Rose, the defendant in this case was the principal and the supervisor of Mr. Wilbanks, were motivated by retaliatory animus towards Wilbanks is not an issue. The school board's decision was an exercise of independent judgment. The process afforded Wilbanks freed the decision of any taint by Rose. We will not disturb the school board's decision. Yes, Your Honor. I think you may be misinterpreting it. I mean, there are a lot of cases where someone is alleging retaliation and then you look at the facts and somebody else was an independent decision maker. It doesn't have to be that there was a state proceeding or something like that. It's just they didn't make the decision. And then you get into the whole cat's claw thing. Why wasn't that what the judge was saying? That's an excellent question, Your Honor, because I've gone round and round in my own mind about this question. But I think because the judge, and I don't think it's clear, but the judge really focused on that due process if you look at the transcript of oral argument. And I think it's really the fact that Rose, the court recognizes that Rose may have had retaliatory animus. So let's look at that and then let's look at the adequacy, and this was briefed as well, of this independent judgment or investigation of the school board. All of the information received by the school board, granted they did see the two videos, but the remainder of the investigation was solely based on information provided by Rose. Now this was kind of confusing, I mean it was fleshed out in the depositions and talked about in motion for summary. Donald Wood was human resources director. Donald Wood essentially provided a summary to the board. But in his deposition, Donald Wood said, when he was asked, what did you do to investigate this? He said, why talk to Rose? Mr. Wood, did you interview the students? No. Did you interview Mr. Wilbanks? No. Did you do anything independent other than speaking to Mr. Rose? No. Further, in terms of, if we get into the adequacy of the, I do think there are two issues, and I'd like to address the fact that I don't think, I don't believe that the school board's decision regardless was an exercise of independent judgment, which is kind of where I'm going as well. The school board's own lawyer, in an email said, just to be clear, this is more of a report to a board than a hearing. There's nothing to indicate that the school independently investigated this case. Well, let's talk about the videos. That's where I was hoping you'd go. Absolutely. So the school board saw the videos and said, okay, hypothetically, that's enough. And that's going to be essentially a Pelley's argument, correct? I mean, I assume. Worked below. It did. Well, I'm not clear, Your Honor, if that actually was the basis for the district court's decision to be clear. If you look at the order from the district court, he even says, whereas a Pelley mentioned that Mr. Wilbank slammed the child into the wall, the district court says, well, they were kind of going back and forth and there was momentum. That didn't happen. And he really never, the district court never goes through, really goes through the McDonnell-Douglas prongs. I mean, he doesn't really say, you know, you met, there was protected activity. The order doesn't really do an analysis of the prongs, whether a prima facie case was met or not. It's fuzzy, frankly. But let me get back to your question about the videos. I think a perfect analysis is an excessive force case. We all are inundated these days with terrible police shootings. Well, I say terrible. Maybe they weren't terrible. I think that's just the point. You know, you see a video, a snippet of a video on the television and you say, maybe as a layperson, this is terrible. That police officer, you know, he's going to jail. And then that case goes to a jury and the jury finds that it was a justified shooting. What happens in a case like that? Context. And here, the only context provided to the school board was by Rose, who the court clearly states may have had retaliatory animus. And that's where I say the school board then could not have, without having all the facts, they could not have made a clear, you know, they didn't do an investigation, frankly. And so their judgment in a sense wasn't independent because it was tainted potentially by Rose's retaliatory animus. And again, this is a motion for summary disposition. In the second video, there's a lot less to see. Yes. Is it undisputed that Wilbanks put his hands on the individual before he was mouthing off or resisting? Did he initiate contact is the point I'm making? Yeah, as the student tried to flee the hall, he put his hand around his arm. In the second video. Yes. On the stairs. Yes. And so let me talk about that a little bit. Again, context. The disciplinary records of these students are in the record. And certainly, I don't want to imply that, you know, these children should be manhandled. I'm not implying that at all. I mean, you know, I'm a parent. There's certainly been times when my daughter was very young. She was a toddler. She went to run out into the street. What did I do? I grabbed her on the arm. You know, we're in the parking lot. No, no. I held my hand and I grabbed her. These are cognitively impaired children. And this student in particular, if you review his record, really was a student who potentially posed a danger to himself and others. I believe just that morning he had, well, prior to the incident, he was throwing things in the classroom, threatened another student. The student has been, there had been a previous assault. Obviously, the student had poor impulse control. So then there's a concern of what happens if the student is allowed to flee. YCF policy says we can't allow students to be alone running around the hall. If Mr. Wilbanks had not tried to stop the student, and the student had left the building and something happened to the student, there would have been liability as well. It's a Hobson's choice. And so none of that information, or none of those types of facts were presented to the board. The student's disciplinary record is not presented to the board. And it's interesting because later Mr. Rose himself is involved in a very serious physical altercation with the student. The same Mr. Rose. He does not lose his job. He has a student that he brings down to his office, to the principal's office. This student is agitated, but what does he do? The student leaves. He just leaves. He's like, I'm out of here. What does Mr. Rose do? Mr. Rose follows the student. He goes after him, and he tackles him, takes him down to the ground, holds him down on the ground. The student has a red mark on his neck. Mr. Rose keeps his job. It's interesting that an employee, another employee involved in a more, frankly, again, these are questions of fact, but a jury could see as a more serious and violent altercation, kept his job. He was also currently a defendant in this lawsuit. And that's why I say context is important. So if the school board's decision, if, you know, at a minimum, there are questions of fact about Rose having retaliatory. How many incidents were there with Rose? There was one incident, Your Honor. And didn't he get more punishment out of that than your client did out of his first incident? Well, the first incident... I mean, the differential treatment runs in the other direction on the first incidents. That's true, Your Honor. Absolutely. But again, these are all questions of fact that a jury could weigh in deciding whether there's retaliation. I get that they're questions of fact. In pretext, it has to be similarly situated, and this is about a firing after a second incident and a warning. But the first incident really, you know, was a non-issue. I mean, there was a discussion of a warning, but there was, you know, there was nothing even put in the student. There was nothing to indicate the incident in the student records. It seemed as if this... You said don't put your hands on students. Wasn't that the directive? I believe Mr. Rose did say that. But I think there's a difference between placing. If every teacher was prevented from placing their hand on the arm of a student... They pretty much are. Well, actually under... Your Honor, I hear what you're saying, but actually under IPSE community schools' policies, they are not. IPSE's own policies say that a teacher actually can physically intervene with a student, this is the board policy, to prevent harm to self or other or to quell a disturbance. So, actually, Mr. Wilbank's actions were authorized under the policy itself. Oh, I'm sorry, Your Honor. I'll give questions in rebuttal. Thank you. Good morning. May it please the Court. Jeff Girish on behalf of the Ypsilanti School Defendants. This is one of those employment discrimination slash retaliation cases where it helps, I think, to take a step back and take a bird's eye view of the facts without peeking at the allegations. And I submit if you do that, if you explain the facts of this case, all the facts, to a layperson or even to a lawyer, and then said, what protected class is at issue here? Discrimination against what protected class? They would have no idea. And even if you said, is it age, race, gender, disability? They would have no idea. And even if you told them the claim is that Mr. Wilcox was retaliated against in order to protect what protected class, they still wouldn't know. And my point is, when, as here, a plaintiff is limited to the McConnell-Douglas test, I think it's important to remember that test isn't to devolve into a debate about the merits of the reason given for termination. That test still has to leave open an inference of unlawful, intentional discrimination. And when you look at this case, is there any suggestion or evidence that he was terminated because of unlawful discrimination against persons with disabilities? Of course there's not. He was terminated because of the incident, the second incident that followed a warning with the student. And basically all the argument that we've heard in the briefing, and even today, is argument about the judgment call, whether it was a right, whether it was fair to fire him, whether it was excessive, whether the content... Did the school district fire other teachers for physical contact? I don't know. I don't know. And I understand that this goes towards pretext, but I think it's important to start with the proposition that you cannot simply prove pretext by showing that you disagree with... It's not a jury question whether they simply disagree with the decision to terminate him. There still has to be a showing of unlawful discrimination. And when you look at the factors here, that's why they fail. The first two factors of the McConnell-Douglas test that I've talked about in the brief, neither one of them is met, but they're especially not met when you consider them together. And that is, he did engage in protected conduct, and they didn't know about it. What he points to primarily is these September emails where he's complaining about staffing. Now those in and of themselves, I would say, are not protected conduct. We've argued that they're not, because they're generic complaints in the employment setting. They're not complaints about discrimination against persons with disability. But the board didn't even have those. The only email the board got was the October 20th email, and this was after they had already taken action against Mr. Wilcox. And this email was simply him presenting his side in the incident with the student. He puts in toward the end, by the way, I also have a problem with staffing. If you would increase staffing in the classrooms, it would make these less likely. Well, that is a classic example of a kind of a generic complaint that is not a specific complaint about discrimination for which he was retaliated against. And that's where his claim fails. Even if someone were to agree, they probably shouldn't have been fired, it was an excessive force. That's not the issue. The issue, and the only claim that's been asserted is, did they fire him in retaliation for his having complained of discrimination against persons with disabilities? That's it. And clearly that's not met, because they didn't even know about the emails in which he was complaining about staffing, which again I would submit don't even qualify as a specific complaint about discrimination. Now I lost my train of thought. If no other category of students is supposed to have the kind of staffing that he complained he didn't have in his classroom... In other words, when you have disabled kids in a classroom, there are lots of levels of additional staff that are pretty typically provided, depending on the level of disability, and those kinds of facts. So if his claim is that the only classrooms that should have had the kind of staffing I was complaining I needed were classrooms of disabled kids, and I was complaining that I didn't have the staffing that I needed for those kids, why would that not be a complaint about treatment of disabled children? Because a complaint about staffing, just like a complaint about compensation for the teachers, or any other complaint about conditions for the teachers, could always be viewed, I suppose, as a complaint about discrimination of those students. Is that a complaint about the needs of the teacher, or is that a complaint about the needs of the children? Yeah, I think it could fairly be characterized as both. But you could say that also about a complaint about salary. We don't have enough resources. We're not being given enough resources. I need to make more money, my assistant needs to make more money, or you're going to lose us, and that's going to harm the students. But didn't he say something about staffing in the classroom? He did. But my point is twofold. One, the complaint about staffing and nothing more is... Didn't he identify the reason there should have been more staffing, which was because it was the nature of the classroom? Certainly not in his October 20th email. The October 20th email, which is the only email that the board got, simply said, toward the end, staffing problems this year have further complicated matters and made the situation in my room even more untenable to consider. And then he goes into talking about staffing requirements. And that's after he's given his side of the story with regard to the incident. But the earlier one mentioned it. Maybe. I think that might be right. Rice knew about it, right? I'm sorry? Rose? Rose knew about it. Right, the principal, right. But the board didn't. Right, except that the board really just rubber-stamped his recommendation. I mean, if it's a cat's paw, it matters whether Rice... Rose. I'm sorry, I don't know why I keep saying that. Rose knew about it, right? Well, my understanding of cat's paw is if the decision maker, which is the board here, uses somebody to carry out their directive, then it applies. But that's not what happened here. What they're saying is the board didn't conduct an adequate investigation. That's what they're saying. In fact, you heard it today. If they had only investigated this, if they had gotten more information... I think what she's saying is that the board did not conduct the type of independent investigation that would sever the tie with Rose as acting in retaliation. That's probably fair. You've articulated it better than she ever has. But my point is, even so, that doesn't show intentional discrimination. The failure to conduct an investigation... And by the way, they had the videos. They looked at the videos and they saw what happened. So the suggestion that they needed to go beyond that and disbelieve Rose... What is the rule? What about the video supported the discharge? Well, Judge Batchelor is right. Teachers can do almost nothing these days. I remember when I was in grade school, we used to get spanked. Things have changed a lot since then. You can't really touch the students. And he was warned. And on both incidents, which were captured on video, in one he pinned the kid against the wall and the kid complained. And in the second episode, it shows on the video that he grabbed his wrist and the kid complained. So this is what the Board is faced with. A second episode in three incidents where he was just warned you can't put your hands on the students. And the rule with regard to investigations is they've got to show that the Board knew about his engaging in protected activity. Not that they could have known about it if they had conducted a more detailed investigation. That's what they're saying. The Board didn't know about the September complaints about staffing at the time they took the action they did on October 8th. All they knew was the video and the description of what had happened, which was consistent with the video. So they didn't even have any knowledge of the protected activity that supposedly is the basis for their retaliation.  And again, pretty much everything in their brief and even today, she talks about failure to conduct investigation should have known. Should have done something differently. Should have looked behind this. It doesn't give rise to a jury submissible claim because they had to have known. That's the whole purpose of retaliation. You've got to prove that they knew about this protected activity. I don't really understand the argument that they've made about the trial judge's comments on due process. The judge did seem to find a due process angle and he asked the parties to submit supplemental briefs, which they did. Then in his opinion, though, he dealt with a straight retaliation claim and why it fails. So I haven't even briefed the due process part of it. I don't think that's really part of the calculus. He gave one of several reasons he could have as to why the retaliation claim fails. Essentially, Judge White, you said it correctly, the decision was made by the board independently without knowledge of his having engaged in protected activity. That's really where the case fails. And we think he didn't even engage in protected activity. Those are the issues, Judge Batchelor and Judge White, you've explored today. I still think it's not enough. And when you're talking about the McDonnell-Douglas test and drawing these inferences, especially in the context of retaliation, I would submit there has to be specific complaints talking about discrimination. Any kind of generic complaint about staffing, pay, the type of garden variety complaints that you're going to hear in the work environment shouldn't be enough. No. Every complaint was about staffing. And my argument is it's not. If you're complaining about staffing, yes, of course it has a component of protecting the students. But it's not a complaint about discrimination. What do you have to say? If you say this is a special ed classroom, these kids need more supervision, I had a problem just last week because I was alone and I couldn't attend to both the class and the student. We've got a real problem here. What do you have to say? I would think, again, in the context of a work complaint, it's got to be more specific. You have to say state law requires... Well, you've got to tie it to discrimination against persons with disabilities. That's what he didn't do. Saying I need more staff is not the same thing as saying you, school district, are discriminating against people with disabilities. Is it enough to say this isn't fair to the kids? I don't think it is, because that's an example of a generic complaint that any teacher would make in connection with any complaint about their environment. And I understand that it can be construed that way. So if Rose reads that and he goes, oh, boy, we have a troublemaker here. He wants more help in the classroom. Well, guess what? I would like more help in the classroom too. So would everybody else. But we don't have the money. It doesn't matter what the law says. And this guy needs to go. If you find that the complaint does qualify as a complaint about disability discrimination, then you would say that that's enough. But to me, a complaint about staffing, even if you're tying it to the well-being of kids, is not complaining about disability discrimination. I think it needs to be more specific. It's got to be more specific than that. Do you have a case that says that? Yeah, I cited a case that articulates the standard, I think, in a way that makes pretty good sense. Granted, it's a district court case, but it's in... It was a New York district court case, I'll find it in just a second, where the court said in this setting... This is referring to an informal complaint about the environment by the plaintiff. And here I'm quoting from the court. It's on page 18 of my brief. Such informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by federal anti-discrimination law. And that's RISCO, R-I-S-C-O, B McHugh, 868 F sub 2nd 75. I will just thank the court for its time. I see my time's up. You've had some very interesting cases today. Thank you, counsel. Very quickly, your honors. There were very specific complaints. I'd like to cite to the record 20-1, page ID 356, page 6 of my brief.  There's been talk about removing our kids, he's referring to his special education kids, from their current inclusion in Gen Ed elective classes and putting all the students in our two self-contained rooms together to form our own segregated elective section. This has taken place each of the last two years despite our protest. Since this is the only Gen Ed contact most of our students will have this year, we would not be providing FAPE, which is federal law, free access to public, sorry, I think it's federal access to public education, appropriate education, to our students and thereby in violation of the intent and letter of federal law. How should we proceed? Perhaps most important is staffing. Then he says, given the law governing caseloads, the requirements outlined in our students' IEPs, and most importantly in the needs and interests of our students. Case law is clear that advocating on behalf of special education students is protected activity. He's not just saying, my caseloads are too high. He's talking about IEPs because in IEPs it will say, student A needs an aid. Did you ever register complaints in that setting without it triggering this? That's what they do. It's okay if you don't. It's okay to register the complaints, but it's not okay to be fired for them. The 11th Circuit in Stimson v. City of Tuscaloosa talking about the cat's paw says that the decision maker can be reliable for retaliation even if the decision maker, i.e. the school board, had no retaliatory motives. When does that happen? The quote from the 11th Circuit in this case is, when the decision maker followed the biased recommendation without independently investigating the complaint against the employee. So here, the decision maker, school board, got their information basically all from Rose, who the district court kind of acknowledges may have had retaliatory animus. They can be held liable for Rose's retaliatory animus towards Wilbanks. Is it not the case that the school board did in fact have the videos? They did have the videos. That was the information. In regard to Rose, they had the videos. They did. What is the school board supposed to do with a teacher who, on more than one occasion, but more importantly having been warned not to do it, puts his hands on a student? Your Honor, it depends. It depends on context. That's why normally you have an investigation, an actual investigation. What troubles me about this case is if it is the fact that the instructors were not to be putting their hands on the students. That in fact is not the fact, Your Honor, with all due respect. As a matter of fact, as I mentioned, Ipsy's school board policy, and it's cited in the record. He was instructed that way after the first incident. He was. Then later the school board, the actual school, sent out a confirming email. It's also in the record. Two staff talking about when they could physically intervene with students. In that email, there was no blanket prohibition against physically intervening. The concern here is that there is clearly a general, don't put your hands on the kid. Sure, I understand that, of course. He put his hands on the kid and he was told, don't do it again. He did it again. I'm struggling with the idea that context is what matters here when in fact it would appear from the videos that it's not disputed that these two incidents did happen. It is not disputed that he was specifically told, don't do it again. Would you like me to respond, Jerome? Again, I think you can't take context out of it because really, would it be okay if he just tapped the kid on the back or you just put your hands on them? That's why I think context is important. That's all I have. Thank you.